An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the *North Carolina Rules of Appellate Procedure*.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-80

Filed 15 July 2026

Carteret County, Nos. 20CR051570-150, 20CR051571-150

STATE OF NORTH CAROLINA

v.

SHAQUILLE CARTER, Defendant.

Appeal by Defendant from judgment entered 12 July 2024 by Judge Bob R. Cherry in Carteret County Superior Court. Heard in the Court of Appeals 9 September 2025.

> *Law Office of Christopher J. Heaney, by Attorney Christopher J. Heaney, for defendant-appellant.*
>
> *Attorney General Jeff Jackson, by Assistant Attorney General Danielle M. Orait, for the State.*

STADING, Judge.

Shaquille Carter ("Defendant") appeals from final judgment entered upon a jury's verdict convicting him of involuntary manslaughter and possession of a firearm by a felon. On appeal, Defendant argues the trial court failed to intervene ex mero motu during the prosecutor's closing argument. Defendant also maintains the trial court erred in calculating his prior record level at sentencing. After careful

consideration, we hold no error in part as to the trial, vacate and remand in part as to the sentencing.

## I.  Background

On 30 May 2020, Travis Bunch (the "victim") was shot in Atlantic Beach and later succumbed to his injuries.  On 21 February 2022, a Carteret County grand jury returned true bills of indictment, charging Defendant with involuntary manslaughter and possession of a firearm by a felon.  Defendant's trial commenced on 8 July 2024, in which the evidence tended to show that Defendant and his girlfriend, Felicia Frink, went to Atlantic beach for an annual family trip in May 2020 after being invited by the victim.  The victim attended the vacation with his girlfriend, Diamond Parks.

On the night of 30 May 2020, Defendant, Ms. Frink, Ms. Parks, and the victim (collectively, the "group") decided to go fishing together at a nearby pier.  Defendant and Ms. Frink drove separately from the victim and Ms. Parks.  The group met up in the parking lot of the Oceanana Motel near the pier.  Ms. Parks testified that upon arrival, Defendant and Ms. Frink "pulled in beside" her and the victim.  After the group parked their cars next to each other, Ms. Parks testified to calling her mother to check on her.  Meanwhile, Defendant and the victim were having a conversation.

Sometime during Ms. Parks's phone call, she observed Defendant and the victim "tussling" over a gun owned by the victim.  Ms. Parks testified that she attempted to tell Defendant and the victim to put the gun down, but that "it had went off . . . mid-sentence."  Ms. Parks recounted that Defendant and the victim "were

wrestling or horseplaying" when the gun discharged, and that they were not angry at each other:

> A.     I just heard [the victim] say, "Man, we're going somewhere because I got my gun on me." And that's when [Defendant] approached, and they were wrestling or horseplaying, however you want to say it, and then the gun goes off.
>
> Q.     Were they angry at each other or just playing?
>
> A.     Just playing.

After hearing the gun discharge, Ms. Parks observed a gunshot wound to the victim's pelvic area and observed that the victim had also been "struck in his hand."

Ms. Parks and the victim immediately left the scene "trying to find the nearest hospital." Upon arrival at a Carteret General Hospital, Ms. Parks was informed that the victim needed to be transported to Vidant Medical Center in Greenville and she was not allowed to ride in the ambulance since she was not family. Defendant drove Ms. Parks to Greenville given her inability to travel in the ambulance. Ms. Parks testified that during the trip, Defendant "kept saying he didn't know there was a bullet in the head of the gun," and that "he was so sorry and . . . wished it never happened." Ms. Parks also received a call during this time, notifying her that the ambulance had to "make an emergency stop" at New Bern Hospital. The victim ultimately passed away at New Bern Hospital after suffering cardiac arrest.

Patricia Burke, the attending paramedic who helped transport the victim from Carteret General to New Bern Hospital, testified to transporting the victim due to a

gunshot wound. At the time, Ms. Burke observed that a registered nurse's report stated the victim suffered a "self-inflicted gunshot wound." However, upon asking the victim, he claimed that he did not shoot himself; and upon observing the victim's injuries, Ms. Burke did not believe they were consistent with a self-inflicted gunshot wound:

> Q. So what question did you ask him, based on that?
>
> A. So when I got done with my report from the RN, I asked the patient what type of gun, what caliber of weapon he shot himself with, and he told me that he did not shoot himself.
>
> Q. Okay.
>
> . . . .
>
> Q. Did it look like a self-inflicted gunshot wound to you?
>
> A. In the years of experience that I have had, the angle of the wound did not seem consistent with something that could possibly be done by the patient himself.
>
> Q. By the patient himself, because it was a wound to the left hand –
>
> A. Yes, sir.

Ms. Burke also asked the victim what type of gun he was shot with and who shot him, to which she received no clear answers. Maragaret Le Senechal, a forensic scientist with the North Carolina State Crime Laboratory, testified as an expert witness in firearm examination at trial. Ms. Senechal testified that the victim was shot by a bullet from a Glock .40 Caliber semiautomatic pistol.

Dr. Anuradha Arcot, a forensic pathologist, testified that the cause of the victim's death "was a gunshot wound to his abdomen or pelvis with the blood loss, which is exsanguination, and the manner is homicide." Dr. Arcot opined the gunshot wound was inconsistent with a self-inflicted injury, and that the bullet traveled through the victim's hand, lodging into his hip bone. Dr. Arcot also noted that Defendant's blood alcohol concentration was "110-milligrams per deciliter."

Several police officers also testified at Defendant's trial. Lieutenant Sharon Culpepper, with the Atlantic Beach Police Department, testified that she was dispatched to the Oceanana Motel on the night in question. Upon arrival, a couple approached Lieutenant Culpepper, advising her that "they heard what sounded like a muffled gunshot." Ms. Parks and the victim, however, had already left the Oceanana Motel before Lieutenant Culpepper's arrival. Doug Harvey, a Lieutenant with the Atlantic Police Department, testified to speaking with Defendant, Ms. Parks, and Ms. Frink at Carteret General Hospital. Lieutenant Harvey's report noted the following statement made by Defendant:

> "[Defendant] stated to me that he and [the victim] were horseplaying around in the parking lot at the Oceanana when the gun accidentally went off. [Defendant] stated that both he and [the victim] started jumping around because both thought they had been shot. It was at that time [Defendant] realized that he was okay but said that [the victim] was still yelling and hopping around. [Defendant] helped [the victim] into the vehicle and headed to Carteret Health Care. I asked [Defendant] who had the gun, and he stated that it was [the victim's]. I asked [Defendant] where the gun was now, and he stated he did

not know where the gun was, saying that he never saw the gun."

His report also noted the following statement made by Ms. Parks:

> A.     Yes, sir. Reading from my report. "Diamond Michelle Parks is the girlfriend of [the victim]. Parks stated [Defendant] and [the victim] were laughing and playing around when she heard a gunshot. Parks then saw [the victim] hopping around and yelling. [The victim] got into the car which was driven by Parks and they went to Carteret Health Care. Parks told me that she did not see a gun, only heard the shot. Parks said that she does not know where the gun is at."
>
> . . . .
>
> Q.     Parks stated that Carter and [the victim] were laughing and playing around when she heard a gunshot; correct?
>
> A.     Yep.
>
> Q.     Parks then saw [the victim] hopping around on, and yelling?
>
> A.     Correct.
>
> Q.     Then [the victim] got in the car?
>
> A.     Right. Which was driven by Parks, and they went to the hospital.

Lieutenant Harvey also testified to receiving the following information from Ms. Parks thereafter on 3 June 2020:

> A.     . . . I asked her what [the victim] was saying to her when she was driving him to the hospital. She said that [the victim] was telling her that he was going to die. Parks said that [the victim] did not say who shot him and did not know how the gun went off. She does not know how the --

- 6 -

she doesn't know who had the gun and did not know why the gun was even in Atlantic Beach on that day. She stated that [Defendant] and [the victim] were horseplaying around and said that . . . she yelled at them to both stop playing around when she heard the gunshot. Then she later on said [the victim] got out of the car to check and see if he was hit then got back in and told her to drive to the hospital.

At the conclusion of trial, the jury convicted Defendant of involuntary manslaughter and possession of a firearm by a felon. The trial court thereafter proceeded to sentencing, where it received arguments from the parties concerning the calculation of Defendant's prior record level ("PRL"). The State calculated Defendant as a PRL V, arguing that he possessed fourteen prior record points:

> [THE STATE]: . . . Judge, the State has calculated prior record points at 14. We have added an extra point because it says if all the elements of the present offense are included in any prior offense, whether or not the prior offenses were used in determining prior record level, you get an extra point. That would knock it up to 14 points, level five. I have authority I handed to Mr. Suggs supporting the extra point which would make him level five.
>
> . . . .
>
> THE COURT: Thank you. One second. Let me review it . . . . For sake of clarity, before I begin with [defense counsel], which prior conviction . . . from the back of this form are you saying qualifies for the extra point for either involuntary manslaughter or possession of firearm by felon?
>
> [THE STATE]: The attempted possession of firearm by felon which he committed six months after this offense.
>
> . . . .

[THE STATE]: They did it in district court.

THE COURT: -- 54802, and that was in Brunswick County.

[THE STATE]: Correct.

THE COURT: Okay. And that shows conviction date of 10/29/21.

Defendant objected to the State's calculation, contending that it erroneously included an additional point for his attempted possession of a firearm by felon conviction from 29 October 2021.

The trial court ultimately concluded that Defendant was a PRL V for the purposes of sentencing. For the involuntary manslaughter conviction, the trial court sentenced Defendant to 25–39 months in the Department of Adult Correction. And for the possession of a firearm by a felon conviction, the trial court sentenced Defendant to a consecutive term of 19–32 months imprisonment. Defendant timely delivered his notice of appeal at the conclusion of sentencing.

## II.   Analysis

Defendant asserts the trial court erred in failing to intervene ex mero motu during the prosecutor's closing argument. Defendant also contends that the trial court erroneously calculated his PRL during sentencing. We consider each issue in turn.

### A.   Lack of Intervention

Defendant argues that the trial court should have intervened ex mero motu

during the State's closing argument because the prosecutor commented on his silence and "told the jurors that the defense 'owes' them an explanation." Defendant maintains these statements violated his due process rights because the prosecutor impermissibly suggested that Defendant had the burden of proving his innocence. Defendant also argues that he suffered prejudice because of the trial court's failure to intervene since the State's remaining evidence was "susceptible to reasonable doubt."

"The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*." *State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (citation omitted); *State v. Smith*, 351 N.C. 251, 268–70, 524 S.E.2d 28, 41 (2000); *State v. Reber*, 386 N.C. 153, 163, 900 S.E.2d 781, 789 (2024). In other words,

> the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.

*Jones*, 355 N.C. at 133, 558 S.E.2d at 107.

Thus, where a defendant does not object "to the prosecutor's improper argument and the trial court fails to intervene, the standard of review requires a two-

step analytical inquiry: (1) whether the argument was improper; and, if so, (2) whether the argument was so grossly improper as to impede the defendant's right to a fair trial." *State v. Huey*, 370 N.C. 174, 179, 804 S.E.2d 464, 468 (2017).

As to the first prong, "[i]mproper remarks are those calculated to lead the jury astray." *Jones*, 355 N.C. at 133, 558 S.E.2d at 108 (citation modified). It "is improper for lawyers in their closing arguments to 'become abusive, inject [their] personal experiences, express [their] personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record.' " *Huey*, 370 N.C. at 180, 804 S.E.2d at 468 (citation omitted) (alterations in original); *see also* N.C. Gen. Stat. § 15A-1230 (2025) ("Limitations on argument to the jury."). Despite these confines, however, our courts have long recognized that " 'prosecutors are given wide latitude in the scope of their argument' and may 'argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom.' " *State v. Phillips*, 365 N.C. 103, 135, 711 S.E.2d 122, 145 (2011) (quoting *State v. Goss*, 361 N.C. 610, 626, 651 S.E.2d 867, 877 (2007)); *see also Huey*, 370 N.C. at 180, 804 S.E.2d at 469.

As to the second prong, "grossly improper argument is defined as conduct so extreme that it renders a trial fundamentally unfair and denies the defendant due process." *State v. Fair*, 354 N.C. 131, 153, 557 S.E.2d 500, 517 (2001) (citation modified); *see also State v. Parker*, 377 N.C. 466, 472, 858 S.E.2d 595, 599 (2021). Indeed, "[o]nly an extreme impropriety on the part of the prosecutor will compel this

Court to hold that the trial judge abused his discretion in not recognizing and correcting ex mero motu an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Anthony*, 354 N.C. 372, 427, 555 S.E.2d 557, 592 (2001) (quoting *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693 (1996)). To that end, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned. For an appellate court to order a new trial, the relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Huey*, 370 N.C. at 180, 804 S.E.2d at 470 (citations and quotation marks omitted). When "determining whether a prosecutor's statements reached this level of gross impropriety, we consider the statements 'in context and in light of the overall factual circumstances to which they refer.' " *Id.* (citation omitted).

That said, "only when it finds both an improper argument and prejudice will this Court conclude that the error merits appropriate relief." *Id.* at 179, 804 S.E.2d at 468 (citation modified). "This is an exceedingly high bar." *Reber*, 386 N.C. at 163, 900 S.E.2d at 789. Moreover, if there is "overwhelming evidence against a defendant," our Courts "have not found statements that are improper to amount to prejudice and reversible error." *Huey*, 370 N.C. at 181, 804 S.E.2d at 470; *see also, e.g., State v. Sexton*, 336 N.C. 321, 363, 444 S.E.2d 879, 903 (1994) (internal citations omitted) ("While the statements constituted error, defendant has the burden of showing that the error was prejudicial. Defendant failed to object, and considering all

the facts and circumstances revealed in the record which showed overwhelming evidence against defendant, defendant has failed to show that the error was prejudicial.").

Relevant here, "it is axiomatic that a criminal defendant is entitled under the Fifth Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment, to remain silent and to refuse to testify. This right is also guaranteed under Article I, Section 23 of the North Carolina Constitution." *State v. Ward*, 354 N.C. 231, 250, 555 S.E.2d 251, 264 (2001) (citations omitted and modified). A "criminal defendant may not be compelled to testify, and any reference by the State regarding his failure to testify is violative of his constitutional right to remain silent[.]" *State v. Trull*, 349 N.C. 428, 452, 509 S.E.2d 178, 194 (1998) (quoting *State v. Baymon*, 336 N.C. 748, 758, 446 S.E.2d 1, 6 (1994)); *State v. Gilbert*, 299 N.C. App. 720, 722, 919 S.E.2d 377, 379 (2025) (quoting *State v. Reid*, 334 N.C. 551, 555, 434 S.E.2d 193, 196 (1993)) ("Because a criminal defendant's right to remain silent is constitutionally and statutorily protected, 'a prosecution's argument which clearly suggests that a defendant has failed to testify is error.' "); *State v. Williams*, 341 N.C. 1, 14, 459 S.E.2d 208, 216 (1995) (citation omitted) (noting "it is well-settled law that 'in closing arguments a prosecutor may not comment on the failure of a defendant to testify at trial.'"); *State v. Parker*, 298 N.C. App. 262, 268, 914 S.E.2d 97, 102 (2025) ("It is wholly impermissible to reference a criminal defendant's exercise of their right to remain silent during trial or closing argument.").

Here, Defendant asserts the following statements, made by the prosecutor during closing argument, amounted to grossly improper arguments that rendered his trial fundamentally unfair:

> They have -- the evidence that we have[.] They also have the ability to call expert witnesses if they want to, and they have the ability to have investigators investigate what's in the report, all this time, four years. They can find out. They can go find witnesses. They can investigate so they can come to court, ready to go. They've had all that.
>
> There's not one witness that's come into this courtroom on behalf of Shaquille Carter to challenge Dr. Arcot, to challenge the SBI lady, to challenge anything.
>
> . . . .
>
> He admitted to shooting [the victim's] gun prior to this date and admitted to shooting guns with [the victim] all the time up in Ahoskie. And he repeatedly -- you heard it -- begging. I'm coming down. I'm going to get a polygraph. I'm going to show you a fingerprint. I'm going to do everything. I'm going to show you how this happened. All right. He comes down. Nothing. Nothing. He's got a right to remain silent, but he sure did talk a big game about coming down and making a big demonstration about showing what happened, and he ain't never showed what happened.
>
> . . . .
>
> [Defense Counsel] does not have to prove anything in this case. He gets the last argument. I don't get to come up here again. I know you're glad of that. I'm glad of that too. I can drink my coffee and relax. But just because [Defense Counsel] doesn't have to prove anything to you, I think he owes it to you -- I think he owes it to you to get up in front of you and demonstrate exactly how he thinks this happened. [Defense Counsel has] told you how he thinks it's happened. . . . I want him to get up here and take these things and show you how it happened, and then tell you

those things show up on the video, which I contend they
don't.

Our review leads us to conclude these remarks were not so "grossly improper
and prejudicial as to deny [Defendant] due process protections." *State v. Moody*, 297
N.C. App. 192, 204, 911 S.E.2d 96, 105 (2024) ("In this case, even if we assume that
the prosecutor's inferential comments are improper statements by the State in service
of its closing argument—mere impropriety is not enough; the comments must be so
grossly improper and prejudicial as to deny the defendant due process protections.").
To be sure, "it is well-settled law that in closing arguments a prosecutor may not
comment on the failure of a defendant to testify at trial." *Williams*, 341 N.C. at 13,
459 S.E.2d at 216 (citations and internal quotations omitted). Here, however, when
read in context, these remarks can also be understood as bringing to the jury's
attention Defendant's "failure to produce exculpatory evidence or to contradict
evidence presented by the State." *Id.* (cleaned up) ("It is permissible for the
prosecutor to bring to the jury's attention a defendant's failure to produce exculpatory
evidence or to contradict evidence presented by the State."); *see also Huey*, 370 N.C.
at 180, 804 S.E.2d at 470 ("[W]e consider the statements in context and in light of the
overall factual circumstances to which they refer.").

Even assuming the prosecutor's remarks were improper, they were not grossly
improper nor prejudicial. *See State v. Moody*, 297 N.C. App. at 204, 911 S.E.2d at
105; *see, e.g., State v. Taylor*, 337 N.C. 597, 614, 447 S.E.2d 360, 371 (1994) (citation

omitted) ("Taken in context, this portion of the prosecutor's argument was a comment on the lack of credibility of the defendant's statements to the police and the defendant's failure to produce evidence to corroborate or explain those statements. This portion of the prosecutor's argument, therefore, did not amount to gross impropriety, and the trial court did not err by failing to intervene *ex mero motu*."). In so holding, "[w]e decline to impose a perfection requirement on the attorneys and trial courts of this State, ever mindful that parties are entitled to a fair trial but not a perfect one." *See Parker*, 377 N.C. at 472–74, 858 S.E.2d at 599–601 (citations and internal quotations omitted) (Trials are not carefully scripted productions. Absent extreme or gross impropriety in an argument, a judge should not be thrust into the role of an advocate based on a perceived misstatement . . . when counsel is silent.").

## B. PRL Calculation

Next, Defendant asserts the trial court erred by concluding that he was a PRL V for the purposes of sentencing. Defendant contends the trial court erroneously treated "attempted possession of a firearm by a felon as including all the elements of possession of a firearm by a felon" pursuant to N.C. Gen. Stat. § 15A-1340.14(b)(6) (2025). As a result, Defendant maintains the trial court erroneously included an additional point in its PRL calculation, impermissibly raising his PRL from IV to V.[1] After careful review, we agree.

---

[1] Notably, the State concedes this error, agreeing with Defendant.

"The determination of an offender's prior record level is a conclusion of law that is subject to *de novo* review on appeal." *State v. Bohler*, 198 N.C. App. 631, 633, 681 S.E.2d 801, 804 (2009). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Hicks*, 243 N.C. App. 628, 641, 777 S.E.2d 341, 350 (2015) (citation omitted). In this case, "the issue . . . is simply whether the competent evidence in the record adequately supports the trial court's decision that Defendant had accumulated [fourteen] prior record points and should be sentenced as a prior record level [V] offender." *Bohler*, 198 N.C. App. at 633, 681 S.E.2d at 804 (citation modified).

"The prior record level of a felony offender is determined by calculating the sum of the points assigned to each of the offender's prior convictions that the court, or . . . the jury, finds to have been proved in accordance with" G.S. 15A-1340.14. N.C. Gen. Stat. § 15A-1340.14(a) (2025). Relevant here, a point is assigned to an offender "if all the elements of the present offense are included in any prior offense for which the offender was convicted, whether or not the prior offense or offenses were used in determining prior record level[.]" *Id.* § 15A-1340.14(b)(6). Under our statutory scheme, the threshold between a PRL IV and a PRL V is fourteen record points:

> (c) Prior Record Levels for Felony Sentencing. - The prior
> record levels for felony sentencing are:
>
> . . . .
>
> (4) Level IV - At least 10, but not more than 13
> points.

(5) Level V - At least 14, but not more than 17 points.

*Id.* § 15A-1340.14(c)(4), (5).

Here, the trial court concluded that Defendant was a PRL V for the purposes of sentencing since he possessed fourteen prior record points. In making this determination, the trial court included an additional prior record point under subsection 15A-1340.14(b)(6) for Defendant's attempted possession of a firearm conviction from 29 October 2021:

> [THE STATE]: . . . Judge, the State has calculated prior record points at 14. We have added an extra point because it says if all the elements of the present offense are included in any prior offense, whether or not the prior offenses were used in determining prior record level, you get an extra point. That would knock it up to 14 points, level five.
>
> . . . .
>
> THE COURT: . . . [W]hich prior conviction . . . from the back of this form are you saying qualifies for the extra point . . . either involuntary manslaughter or possession of firearm by felon?
>
> [THE STATE]: The attempted possession of firearm by felon which he committed six months after this offense.
>
> . . . .
>
> [THE STATE]: They did it in district court.
>
> THE COURT: -- 54802, and that was in Brunswick County.
>
> [THE STATE]: Correct.
>
> THE COURT: Okay. And that shows conviction date of 10/29/21.

Defendant's attempted possession of a firearm by felon conviction cannot be used as the basis for an additional prior record point since it does not include "all the elements of the present offense." *Id.* § 15A-1340(b)(6). Indeed, "the elements of an attempt to commit a crime are (1) an intent to commit the crime, (2) an overt act done for that purpose, going beyond mere preparation, (3) *but falling short of the completed offense.*" *State v. Collins*, 334 N.C. 54, 60, 431 S.E.2d 188, 192 (1993) (citation modified). By contrast, "the offense of possession of a firearm by a convicted felon has two essential elements: (1) the defendant has been convicted of a felony, and (2) *the defendant subsequently possessed a firearm.*" *State v. Floyd*, 369 N.C. 329, 333, 794 S.E.2d 460, 463 (2016) (emphasis added); N.C. Gen. Stat. § 14-415.1 (2025). Since attempted possession of a firearm by a felon does not require that "the defendant . . . possess[ ] a firearm," *Id.*, it does not include "all the elements of" possession of a firearm by a felon. N.C. Gen. Stat. § 15A-1340.14(b)(6). Accordingly, the trial court committed error by including an additional prior record point pursuant to subsection 15A-1340.14(b)(6) when calculating Defendant's PRL at sentencing.

## III. Conclusion

For the reasons above, we conclude that the trial court did not err by failing to intervene ex mero motu during the prosecutor's closing argument. As to Defendant's sentence, however, we hold the trial court erroneously calculated Defendant's PRL at sentencing by including an additional point under N.C. Gen. Stat. § 15A-1340.14(b)(6).

NO ERROR IN PART; VACATE AND REMAND IN PART.

Judges STROUD and ARROWOOD concur.

Report per Rule 30(e).